

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-1-2002

# Coltec Ind Inc v. Hobgood

Precedential or Non-Precedential:

Docket 0-2458

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Coltec Ind Inc v. Hobgood" (2002). *2002 Decisions.* Paper 88.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/88

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 1, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2458

COLTEC INDUSTRIES, INC., a Pennsylvania Corporation;
FOUR LEAF COAL COMPANY, INC., a Tennessee
Corporation; L.G. WASSON COAL MINING CORP., an
Indiana Corporation,
        Appellants

v.

WILLIAM P. HOBGOOD; MICHAEL H. HOLLAND; MARTY
HUDSON; THOMAS O.S. RAND; ELLIOT A. SEGAL;
CARLTON R. SICKLES; GAIL R. WILENSKY, as TRUSTEES
OF THE UNITED MINE WORKERS OF AMERICA
COMBINED FUND; UNITED MINE WORKERS OF
AMERICA COMBINED BENEFIT TRUST;

UNITED STATES OF AMERICA
        (Intervenor in D.C.)

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 93-cv-01955)
District Judge: Hon. D. Brooks Smith, Chief Judge

No. 00-4385

COLTEC INDUSTRIES, INC., a Pennsylvania Corporation;
FOUR LEAF COAL COMPANY, INC., a Tennessee
Corporation; L.G. WASSON COAL MINING CORP., an
Indiana Corporation

v.

WILLIAM P. HOBGOOD; MICHAEL H. HOLLAND; MARTY
HUDSON; THOMAS O.S. RAND; ELLIOT A. SEGAL;
CARLTON R. SICKLES; GAIL R. WILENSKY, as TRUSTEES
OF THE UNITED MINE WORKERS OF AMERICA
COMBINED FIND; UNITED MINE WORKERS OF AMERICA
COMBINED BENEFIT FUND;

UNITED STATES OF AMERICA
        (Intervenor in D.C.)

Coltec Industries, Inc.,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 93-cv-01955)
District Judge: Hon. D. Brooks Smith, Chief Judge

Argued September 19, 2001

Before: SLOVITER, NYGAARD and McKEE, Circuit  Judges

(Filed February 1, 2002)

2

George E. McGrann (Argued)
Schnader, Harrison, Segal & Lewis
Pittsburgh, PA 15222

William H. Powderly, III
Metz, Schermer & Lewis
Pittsburgh, PA 15222

 Attorneys for Appellant
Coltec Industries, Inc.

Peter Buscemi (Argued)
Morgan, Lewis & Bockius
Washington, D.C. 20036

 Attorney for Appellees
William P. Hobgood, Michael H.
Holland, Marty D. Hudson,
Thomas O.S. Rand, Elliot A. Segal,
Carlton R. Sickles, and Gail R.
Wilensky, as Trustees of the
United Mine Workers of America,
United Mine Workers of America
Combined Benefit Fund

Mark B. Stern
Jonathan H. Levy (Argued)
United States Department of Justice
Civil Division, Appellate Staff
Washington, D.C. 20530

 Attorneys for Appellee
United States

OPINION OF THE COURT

SLOVITER, Circuit Judge:

In this appeal, Coltec Industries, Inc. ("Coltec") seeks to extricate itself from its voluntary dismissal with prejudice of its claim against the United Mine Workers of America Combined Benefit Fund and its trustees (collectively "the Fund") that asserted that the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), 26 U.S.C. SS 9701–9722

(2001), was unconstitutional. Subsequent to that dismissal, the Supreme Court in Eastern Enterprises v. Apfel, 524 U.S. 498 (1997), declared the Coal Act unconstitutional as applied to companies in situations similar to Coltec. Coltec then filed motions in the District Court under Federal Rule of Civil Procedure 60(b) seeking to reinstate its constitutional claims. The District Court viewed Coltec as seeking to escape the effects of its earlier agreements in order to benefit from the ruling in Eastern and denied Coltec's attempt to reassert its constitutional claims or to have its liability for Coal Act premiums reduced to zero. The District Court also ordered Coltec to pay to the Fund $7,129,090.97 in premiums and interest. Coltec appeals the rulings of the District Court.

I.

BACKGROUND

Congress enacted the Coal Act to resolve the imminent insolvency of multi-employer trusts created by coal-industry agreements to provide health benefits for coal miners and their dependents. The background of the Coal Act is thoroughly reviewed in Eastern Enterprises v. Apfel, 524 U.S. 498, 504–14 (1997), and thereafter in Unity Real Estate Co. v. Hudson, 178 F.3d 649, 653–54 (3d Cir. 1999), and in Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund, 249 F.3d 519, 521–22 (6th Cir. 2001). We thus summarize only the particular provisions and facts relevant to the case before us.

The Coal Act merged existing trusts into the appellee United Mine Workers of America Combined Benefit Fund and charged the Fund's trustees with collecting premiums from the former employers of eligible retirees and using those premiums to pay the retirees' benefits. Under the Act, the Commissioner of Social Security assigns retirees to their former employers, and the Fund charges premiums based on these assignments.

Coltec was assigned 249 retirees as of February 1, 1993, and the Fund assessed premiums against the company, which made its first two monthly payments (totaling

4

$139,496.36), under protest.1 App. at 232. That November, Coltec and two other companies, Four Leaf Coal Co. and L.G. Wasson Coal Mining Corp., sued the Fund seeking declaratory and injunctive relief (including a contemporaneous motion for a temporary restraining order) from further assessments of Coal Act premiums against them. App. at 19–42. The first four counts of the complaint claimed that the Act was unconstitutional as applied to them under the Fifth Amendment's takings and due process clauses because the plaintiff companies had not signed the relevant agreements. They later added a fifth count alleging errors in the assignments of beneficiaries to them.

In December 1993, the parties executed an agreement (the "Agreement"), App. at 236–37, under which the plaintiffs agreed to withdraw their request for a temporary restraining order. Coltec agreed to establish an escrow account into which it would deposit all premiums due during the pendency of its preliminary injunction motion. The terms were established in a contemporaneous separate written agreement (the "Escrow Agreement"). App. at 232–35. In return, the Fund agreed to deem Coltec's payments into escrow as payments to the Fund and not to treat the other plaintiffs' failure to pay as a default.2 The Agreement provided that the escrow funds, plus interest, would be disbursed to the Fund if the injunction motion was denied or to Coltec if it was granted.

In January 1994, the Fund answered the complaint and counterclaimed, seeking, inter alia, a declaration that the Coal Act was constitutional. Later that month, the United States intervened to defend the Act's constitutionality. In

_____

1. Coltec paid under protest on the ground that the Coal Act was unconstitutional as applied to it because it did not participate in the negotiations for the 1974 or any subsequent National Bituminous Coal Wage Agreements and did not in any other way agree to make contributions under these agreements. App. at 24.

2. Although the complaint was filed by all three coal companies as plaintiffs, and they all entered into the Agreement (but not the Escrow Agreement), depending on the context we will refer only to Coltec as its claims are the only ones at issue in this appeal.

5

May 1996, Coltec and the other two plaintiffs withdrew their preliminary injunction motion, and the District Court dismissed that motion. App. at 126.

Meanwhile, several courts of appeals, including this one, held that the Coal Act was constitutional as applied to coal operators similarly situated to Coltec. See Eastern Enterprises v. Chater, 110 F.3d 150 (1st Cir. 1997); Holland v. Keenan Trucking Co., 102 F.3d 736 (4th Cir. 1996); Carbon Fuel Co. v. USX Corp., 100 F.3d 1124 (4th Cir. 1996); Lindsey Coal Mining Co. v. Chater, 90 F.3d 688 (3d Cir. 1996); Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.), 79 F.3d 516 (6th Cir. 1996); Davon, Inc. v. Shalala, 75 F.3d 1114 (7th Cir. 1996); LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478 (2d Cir. 1995). The Supreme Court had denied certiorari in Blue Diamond, 519 U.S. 516 (1997), Davon, 519 U.S. 808 (1996), and Chateaugay, 516 U.S. 913 (1995). Constitutional challenges by other coal companies were still pending when the plaintiff companies initiated settlement negotiations with the Fund. See, e.g., Eastern Enterprises, 110 F.3d 150, rev'd, 524 U.S. 498 (1998); Mary Helen Coal Corp. v. Hudson, 976 F. Supp. 366 (E.D. Va. 1997), rev'd, 164 F.3d 624 (4th Cir. 1998).

On June 30, 1997, prior to the resolution of the pending constitutional challenges in other cases, the parties in this case signed a stipulation (the "Stipulation") which referenced a decision by the Alabama federal court that resolved a dispute as to the amount of premiums to be assessed under the Coal Act. That decision was affirmed by the Eleventh Circuit. National Coal Ass'n v. Chater, No. CV94-H-780-S, 1995 WL 1052240 (N.D. Ala.), aff'd, 81 F.3d 1077 (11th Cir. 1996) ("NCA"). The Stipulation also referenced the then-pending follow-up case, National Mining Ass'n v. Chater, No. CV-96-N-1385-S (N.D. Ala. 1996) ("NMA"), in which coal companies sought a refund of the differential between the amount they had paid over a period of several years and the amount they would have paid under the NCA formula (the "premium differential"). The Stipulation stated:

> plaintiffs seek either to obtain the benefits of the NMA litigation, should the outcome be favorable to the

6

> plaintiffs in that action, or to retain the right to litigate the issue themselves should the outcome of the NMA litigation be unfavorable to the plaintiffs in that case.

App. at 128.

Specifically, the Stipulation provided that: (1) plaintiffs would amend their complaint to state a new claim seeking the premium differential, (2) defendants would not oppose this amendment, (3) plaintiffs would dismiss with prejudice their five existing claims, (4) the parties would ask the court to stay the premium differential claim pending resolution of the NMA litigation, and (5) upon a final judgment in NMA:

> a) if the said final judgment . . . is favorable to plaintiffs in that case, then [the Fund] will afford plaintiffs in this case the same treatment of [its] new claim . . . as is afforded to the plaintiffs in the NMA litigation; and b) if the said final judgment . . . is favorable to defendants in that case, the stay imposed on the new claim for relief . . . will be lifted, and plaintiffs will be free to pursue that claim . . . and [the Fund] will be free to defend . . . against that claim.

App. at 129–30. In other words, the plaintiff companies would get the benefit of any decision determining that their premiums should have been lower but could litigate that point if the Alabama court found otherwise. Pursuant to the Stipulation, the plaintiff companies amended their complaint to include a new sixth count that concerned the premium differential issue, App. at 132–38, 147–53, and dismissed the first five counts with prejudice. The District Court "so ordered" the Stipulation on July 2, 1997. The District Court then granted the parties' joint motion to stay this case pending the resolution of NMA.

On October 20, 1997, the Supreme Court granted certiorari from the decision of the Court of Appeals for the First Circuit holding the Coal Act constitutional. Eastern Enterprises v. Apfel, 522 U.S. 931 (1997) (granting writ of certiorari). On June 25, 1998, the Court found the Coal Act unconstitutional as applied to companies which had not signed relevant coal-industry agreements. Eastern, 524 U.S. 498 (1998). The decision in Eastern was "splintered." Unity Real Estate Co., 178 F.3d at 658. Five Justices found the

7

Act unconstitutional as applied to companies who, like Eastern and Coltec, had not signed the relevant coal-industry agreements. Only four of those Justices believed that, applied to such companies, the Act was an unconstitutional taking, Eastern, 524 U.S. at 529-37 (plurality opinion), while the fifth believed the Act violated due process but was not a taking, id. at 539-50 (Kennedy, J., concurring and dissenting). The other four Justices would have held that the Coal Act was constitutional as applied to such companies. Id. at 550-53 (Stevens, J., dissenting); id. at 553-68 (Breyer, J., dissenting).

Shortly after Eastern was decided, the plaintiff companies in this case filed three motions in an attempt to avoid Coal Act liability. The first motion requested leave to file a new complaint restating the dismissed constitutional claims and altering the sixth count to claim zero premium liability. The second asked for relief under Federal Rule of Civil Procedure 60(b)(5) or (6) from the dismissal of the first five counts of the complaint which challenged the constitutionality of the Coal Act. The third motion sought to lift the stay of count six (the premium differential). App. at 155-87. On November 9, 1998, while the motions were pending, the Social Security Administration wrote to Coltec voiding Coltec's assignments in light of Eastern (the "SSA letter"). App. at 201.

The District Court denied the three motions on January 25, 1999. App. at 188-95. The District Court held that the Eastern decision did not provide a basis for relieving Coltec of the consequences of its bargain. The court also denied Coltec's subsequent motion for "limited reconsideration" based on the SSA letter, finding that the letter, which Coltec received before the January order, was not new evidence, and that Coltec's reliance on the letter was merely another attempt to reassert the claims it had bargained away. App. at 204.

In May 1999, the NMA parties reached a settlement with the Fund under which the Fund agreed to pay back the premium differential without interest. Supp. App. at 388-93. The Fund, which had agreed in the Stipulation to give Coltec the benefit of NMA if the coal companies were successful in that litigation, offered to offset Coltec's

8

premium differential against Coltec's release of the escrow money, but Coltec denied any liability. Supp. App. at 394–95, 400–03. The Fund then filed a motion asking the District Court to order disbursement of the funds that were believed to be in escrow, App. at 219–20, at which time Coltec first revealed that it had not in fact established an escrow account as it had represented. App. at 287–88. The District Court granted the Fund's motion on July 20, 2000 and ordered Coltec to pay directly to the Fund over $7 million in premiums and interest[3] which should have been in escrow. App. at 297–303. Coltec timely appealed. [4]

Thereafter, the District Court directed the parties to file dispositive motions.[5] It ruled on those motions on December 4, 2000, issuing a final judgment dismissing the Fund's counterclaims as moot and granting Coltec summary judgment on its premium differential claim. App. at 370–78. Specifically, the District Court found that Coltec had made a bargain to forego all challenges to its underlying Coal Act premium liability in exchange for the opportunity to (1) claim the premium differential and (2) gain the benefit of a favorable NMA result while (3) retaining the right to litigate the premium differential issue itself should the NMA outcome be unfavorable to its position.

The court also reiterated its understanding of the parties' deal when it granted the Fund's motion to order disbursement of the escrow funds. It rejected Coltec's argument that the Fund had no right to premiums due to the SSA letter, treating it as another effort by Coltec to renege on its concession of liability in the Stipulation. In response to Coltec's argument that the Agreement required denial of Coltec's initial injunction motion to trigger disbursement of the escrow to the Fund, the District Court found that Coltec's withdrawal and its dismissal of its

_____

3. The order allowed Coltec to offset its payment by the amount of the premium differential (approximately $150,000).

4. We need not decide if we have jurisdiction over that appeal because it has been consolidated with Coltec's later appeal of the final judgment.

5. Around this time, Four Leaf and Wasson settled with the Fund, although the District Court acknowledged that nothing had been entered into the record regarding these settlements. App. at 314, 371 n.2.

9

injunction motion satisfied this condition. Morever, the court held that Coltec's failure to make the agreed upon payments into escrow did not excuse its obligation to pay the amount that should have been (and was represented to be) in escrow.[6]

The District Court held that because the NMA result was undisputedly favorable to Coltec, the Stipulation limited the relief to that afforded the NMA plaintiffs, which necessarily meant that count six was limited to the premium differential and that Coltec could not use count six as a vehicle for recalculating its premiums to zero. The court did award Coltec a $152,717.92 offset against the money it owed the Fund and stayed the judgment pending Coltec's appeal, which this court consolidated with the company's earlier appeal.[7]

II.

JURISDICTION AND STANDARD

The District Court had federal question jurisdiction and this court has jurisdiction under 28 U.S.C. S 1291. The parties disagree as to the standard of review we should apply to the District Court's treatment of the Stipulation, with the Fund advocating a clearly erroneous standard and Coltec advocating a plenary standard. We note that our result in this case would be the same under either standard. This court applies plenary review to a district court's construction of settlement agreements, but should

_____

6. We note our surprise that there is no reference in the record to any sanction imposed by the District Court on Coltec or its attorney for what appears to be years of falsely representing the establishment and existence of an escrow fund, although the District Court did find the conduct "troubling." App. at 302 n.1.

7. On March 27, 2001, the Fund wrote to Coltec and Wasson, offering a partial refund of the premiums they had paid, pursuant to a fund set up by Congress for partially reimbursing companies in their position in the wake of Eastern. Letter from George E. McGrann, Attorney for Coltec, to the Court (May 9, 2001) (enclosing letter from Carl F. Tennille, Comptroller for Health and Retirement Funds (March 27, 2001)) (on file in Clerk's office).

10

review a district court's interpretation of settlement agreements, as well as any underlying factual findings, for clear error, as it would in reviewing a district court's treatment of any other contract. See, e.g., In re Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir. 2000) ("[B]asic contract principles . . . apply to settlement agreements [and] . . . contract interpretation is a question of fact, [thus] . . . review is according to the clearly erroneous standard. In contrast, contract construction, that is, the legal operation of the contract, is a question of law mandating plenary review."). We review the denial of Rule 60(b) relief for an abuse of discretion. Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 653 (3d Cir. 1998).[8]

III.

DISCUSSION

On appeal, Coltec makes several challenges to the District Court's rulings. Primarily, however, the company asserts that the District Court misinterpreted the Stipulation, abused its discretion in denying the Rule 60(b) motion, and had no basis to award money to the Fund. Coltec seeks reversal of the $7,129,090.97 award to the Fund and asks us to instruct the District Court to order the Fund to refund the two premiums Coltec paid, with interest. In the alternative, Coltec asks this court to remand for another recalculation of its premium differential, but it

_____

8. Coltec suggests review is plenary when a district court does not exercise its discretion, citing, inter alia, Twelve John Does v. District of
Columbia, 841 F.2d 1133, 1138 (D.C. Cir. 1988), for the proposition that a denial of Rule 60(b) relief should be reversed if it is based on an error
of law. This is consistent with the abuse of discretion standard. See, e.g.,
Stokors S.A. v. Morrison, 147 F.3d 759, 761 (8th Cir. 1998) ("A district court necessarily abuses its discretion if it bases its decision on an erroneous view of controlling law."). Coltec also argues courts have no discretion to deny a Rule 60(b) motion which is based on the unconstitutionality of the underlying judgment. See Boughner v. Sec'y of Health, Educ. & Welfare, 572 F.2d 976, 977 (3d Cir. 1978). The language Coltec relies on is dictum. This court reviewed such a denial for abuse of discretion in Marshall v. Board of Education , 575 F.2d 417, 422–24 (3d Cir. 1978).

does not respond to the Fund's assertions (1) that Coltec waived this issue by not raising it in the District Court and (2) that the credit is correctly calculated. The Fund defends the District Court's understanding of the parties' agreement and, along with the United States, asserts that the court properly denied Rule 60(b) relief.9

A. Coltec's Coal Act Liability

Coltec contends that it should prevail on this appeal even without the constitutional claims it voluntarily dismissed because its Coal Act liability is zero. Coltec argues that in light of the Stipulation the District Court abused its discretion in declining to lift the stay on count six and erred in holding that its resolution of that count was limited to the two options in the Stipulation.

It is manifest that Coltec explicitly agreed in the Stipulation to dismiss with prejudice its first five counts, which stated constitutional challenges to the Coal Act and a statutory challenge to the company's assignments, thereby forfeiting these avenues of contesting its underlying liability. The District Court "so ordered" the Stipulation and the related dismissal and stay orders. In exchange for Coltec's abandonment of its challenges to its liability, the Fund agreed that Coltec could challenge the amount of its assessments by adding "a new claim for relief that will seek to reduce, by the amount of the premium differential[from NCA], the Coal Act premiums assessed against plaintiffs by [the Fund]." App. at 129. The plain language of the Stipulation thus confined the scope of this new sixth count.

Coltec clearly understood this because its sixth count was narrowly drawn, alleging only that certain offsets due under the Coal Act were under-calculated, resulting in the premium differential, and requesting that the court order the Fund to recalculate its pre-1996 premiums according to the NCA method10 and release the premium differential plus interest to Coltec from the company's payments in escrow. As contemplated by the Stipulation, the sixth count did not

_____

9. The United States takes no position regarding the money judgment. Br. of United States at 10 n.1.

10. From 1996 on, the Fund assessed all premiums according to NCA.

12

challenge either Coltec's assignments or its underlying premium liability based on these assignments.

Moreover, the Stipulation restricted the District Court's ultimate resolution of the sixth count. It provided that the parties would ask to stay count six pending the resolution of NMA and then, if the resolution was favorable to the NMA plaintiffs, the Fund would give Coltec the same treatment regarding its premium differential claim as the NMA plaintiffs received.[11] It also provided that if the outcome were favorable to the Fund, the stay on the sixth count would be lifted and the parties would be free to litigate the premium differential issue. The District Court's stay order recited this language. App. at 145–46. By voluntary agreement and subsequent court order, Coltec's sole remaining cause of action is confined to seeking the premium differential which the Fund has offered Coltec. The Stipulation precludes Coltec from contesting its underlying liability for Coal Act premiums. For this reason, Coltec cannot use count six to state a claim for zero liability or to request a refund of its two premium payments, and nothing in the SSA letter requires otherwise. Thus, the District Court did not abuse its discretion in failing to lift the stay and properly denied Coltec's summary judgment request for relief beyond that afforded the NMA plaintiffs.

B. Coltec's Rule 60(b) Motion

"The general purpose of Rule 60(b) . . . is to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done." Boughner v. Sec'y of Health, Educ. & Welfare, 572 F.2d 976, 977 (3d Cir. 1978). Coltec contends that the denial of relief in this case was an abuse of discretion and that relief is warranted under either Rule 60(b)(5) or 60(b)(6). The relevant portions of the rule provide:

> (b) On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . .

_____

11. On appeal, Coltec does not contest that under the Stipulation the settlement terminating the NMA case was a resolution favorable to the NMA plaintiffs.

13

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60.12 Coltec based its motion in the District Court for relief from the dismissal with prejudice of the first five counts of its complaint on these subsections, and now appeals the District Court's denial of this motion.

1. Subsection (5)

This court has held that "[t]he definitional limitation in subsection (5) is significant in that it empowers a court to modify a judgment only if it is `prospective,' or executory." Marshall v. Bd. of Educ, 575 F.2d 417, 425 (3d Cir. 1978). The District Court held that its dismissal with prejudice of the first five counts does not satisfy the "prospective" requirement of this section. Coltec argues that because there was no money judgment against it at the time of its Rule 60(b) motion, an order allowing it to reassert its constitutional claims would have resulted in a finding that it had no Coal Act liability, which would have given it relief from the prospective application of the Stipulation. It asserts that, therefore, the District Court's finding that the dismissal was not prospective was erroneous and that the court abused its discretion by failing to weigh the equities of the company's motion.

As an initial matter, Coltec's motion asked for relief from
_____

12. The United States argues that Coltec's Rule 60(b) motion is moot because the motion seeks to reinstate claims challenging the constitutionality of the Coal Act despite the fact that the government has already declared Coltec's assignments void and agreed that further assessments against Coltec are inappropriate. However, if we found the District Court abused its discretion in denying Coltec's request for Rule 60(b) relief, it could affect Coltec's right to the premium payments it made (and was supposed to put in escrow). So, while the question of the Act's constitutionality as applied to Coltec may be moot, Coltec's appeal of the denial of its Rule 60(b) motion is not.

14

the dismissal order, not from the Stipulation. Courts have generally held that dismissals with prejudice are not prospective within the meaning of Rule 60(b)(5). See, e.g., Maraziti v. Thorpe, 52 F.3d 252, 254 (9th Cir. 1995); Schwartz v. United States, 976 F.2d 213, 218 (4th Cir. 1992); Picco v. Global Marine Drilling Co., 900 F.2d 846, 851 (5th Cir. 1990); Twelve John Does v. District of Columbia, 841 F.2d 1133, 1139-40 (D.C. Cir. 1988). Coltec cites no authority to the contrary. Instead, Coltec argues that the prospective effect of the dismissal prevents it from reasserting its constitutional claims and defenses. However, as the government notes, this collateral estoppel effect is common to all judgments. If this were enough to satisfy Rule 60(b)(5)'s threshold requirement, then the Rule's requirement of "prospective application" would be meaningless.

Numerous courts have explicitly rejected this argument. See, e.g., Maraziti, 52 F.3d at 254 ("The construction . . . to the effect that a judgment has prospective effect so long as the parties are bound by it, would read the word `prospective' out of the rule.") (quotation omitted); Picco, 900 F.2d at 851 ("The only arguably prospective effect of the . . . dismissal is that it precludes relitigation of the issues decided, which clearly is not enough."); Gibbs v. Maxwell House, 738 F.2d 1153, 1156 (11th Cir. 1984) ("That plaintiff remains bound by the dismissal is not a `prospective effect' within the meaning of rule 60(b)(5) any more than if plaintiff were continuing to feel the effects of a money judgment against him.").

Coltec asserts that the prospective effect it describes is narrower than the collateral estoppel effect at issue in the above cases because the dismissal in this case was executory. This differs, it contends, from the judgment for monetary damages that had been paid and which this court determined was not prospective in Marshall, 575 F.2d 417.13

_____

13. Coltec also analogizes the District Court's interpretation of the Stipulation in this case to the judgment in United States v. Kayser-Roth Corp., 103 F. Supp. 2d 74, 79-80 (D.R.I. 2000) (judgment prospective as to damages when it fixed liability for waste clean-up but left amount of liability dependent on future events). But, as noted above, Coltec's Rule 60(b) motion sought only to vacate the dismissal, not the Stipulation.

15

However, although the court in Marshall sustained the denial of Rule 60(b) relief when the judgment had already been satisfied, the court explicitly noted that even if the judgment had not yet been satisfied, it would not qualify as prospective under Rule 60(b)(5) because "[a]`prospective' injunction envisions a restraint of future conduct, not an order to remedy past wrongs when the compensation payment is withheld from the beneficiaries until some subsequent date." Marshall, 575 F.2d at 425 n.27.

In fact, all of the cases Coltec cites which granted Rule 60(b)(5) relief involved injunctions or consent decrees regulating ongoing behavior. See Agostini v. Felton, 521 U.S. 203, 212 (1997) (injunction preventing certain manner of delivering publicly funded services to parochial school students); Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 374-75 (1992) (consent decree mandating construction of new prison according to specific guidelines); Bellevue Manor Assocs. v. United States, 165 F.3d 1249, 1251 (9th Cir. 1999) (injunction mandating use of specific rent-subsidy calculation method); Marshall, 575 F.2d 417, 419 (injunction requiring compliance with federal wage-and-hour law).

Coltec's point that judgments are prospective when they are executory is not in dispute.[14] There was nothing executory about the dismissal with prejudice of counts one through five. Even though there was no money judgment against Coltec at the time of its motion, it had previously assured the District Court that it was depositing into the escrow account the Coal Act premiums as they were due. See, e.g., App. at 151 ("Plaintiffs have held under escrow certain sums assessed to them for premiums for plan years February 1, 1993, October 1, 1993, and October 1, 1995."); App. at 170 (same); and App. at 198 ("[Coltec] has paid its

_____

14. The United States cites a series of cases in support of this proposition. See, e.g., Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc., 131 F.3d 625, 630 (7th Cir. 1997) (finding judgment not prospective that interpreted contract and continued to affect rights and duties of parties, and stating "[j]udgments are prospective when they are `executory' or `involve the supervision of changing conduct or conditions.' ") (quoting Twelve John Does , 841 F.2d at 1138); Maraziti, 52
F.3d 252, 254 (same).

16

Coal Act assessments since 1993 into an escrow account pending the resolution of the respective rights of the parties, and such monies remain in escrow. This escrow fund contains several million dollars."). It is disingenuous -- in light of Coltec's multiple false statements to both the District Court and the Fund about its escrow payments -- for Coltec to attempt to use its failure to make the promised payments to its own advantage. Therefore, the District Court did not abuse its discretion in finding that the dismissal did not satisfy Rule 60(b)(5)'s threshold requirement of prospective effect.

2. Subsection (6)

Rule 60(b)(6) is a catchall provision which allows a court to relieve a party from the effects of an order for "any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b)(6). However, "[t]his court has consistently held that the Rule 60(b)(6) ground for relief from judgment provides for extraordinary relief and may only be invoked upon a showing of exceptional circumstances." In re Fine Paper Antitrust Litig., 840 F.2d 188 (3d Cir. 1988) (quotation omitted); see also United States Steel Corp. v. Fraternal Ass'n of Steel Haulers, 601 F.2d 1269, 1274 (3d Cir. 1979); Marshall, 575 F.3d at 425.

In rejecting Coltec's Rule 60(b)(6) motion, the District Court relied in large part on the fact that a change in law subsequent to the challenged order rarely justifies Rule 60(b)(6) relief. See Agostini, 521 U.S. at 239; Cincinnati Ins. Co., 131 F.3d at 628-29; Marshall, 575 F.3d at 425-26. In addition, as to the equities of Coltec's motion, the District Court found the company was trying to escape the effects of a bargain it regretted in hindsight and held that there were no exceptional circumstance that would justify allowing Coltec to renege on its deal.

Coltec acknowledges that its decision voluntarily to dismiss its constitutional claims is an equitable factor militating against Rule 60(b)(6) relief,[15] but argues that the

---

15. Alternatively, Coltec appears to argue that the fact the court did not consider the merits of its constitutional claims in granting the dismissal at issue militates in favor of Rule 60(b) relief, citing Lasky v. Continental

District Court abused its discretion by giving determinative weight to this factor. Likewise, Coltec concedes that a change in decisional law is not alone sufficient to justify Rule 60(b) relief, but contends that the District Court abused its discretion by erroneously concluding that a change in law cannot support such relief and declining further to consider the equities of the company's motion. Coltec underscores that the new law in this case was a Supreme Court decision based on a finding of unconstitutionality.

In its ruling denying Rule 60(b) relief, the District Court noted that decisional law cannot alone justify such relief and that Coltec had consented to the dismissal. See, e.g., App. at 190 ("Failing to litigate to its conclusion a matter that could have been pursued . . . all the way to the Supreme Court does not constitute an exceptional circumstance."); App. at 193 ("[A] change in the decisional law after judgment is entered . . . is not considered exceptional and does not justify relief."). However, the District Court considered other equitable factors in the remainder of its opinion, most notably the content and context of the parties' agreement leading to the dismissal. Even if the District Court could have been more explicit in its analysis of the equitable factors, it did not abuse its discretion, particularly since it focused on the principal issue of whether Coltec should be excused from the effects of a deal it voluntarily made.

_____

Products Corp., 804 F.2d 250, 256 n.10 (3d Cir. 1986) ("[I]f relief is sought from a default judgment or a judgment of dismissal where there has been no consideration of the merits, [the court should consider] whether in the particular case the interest of deciding cases on the merits outweighs the interest in orderly procedure and in the finality of judgments, and whether there is merit in the defense or claim, as the case may be.") (quotation omitted).

In light of the voluminous case law mandating a high hurdle for Rule 60(b) relief from consensual orders, see, e.g. , Rufo, 502 U.S. at 383, Bellevue, 165 F.3d at 1253 n.4, Phila. Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1119–20 (3d Cir. 1979), this dictum from Lasky is better understood as applying to adjudications on procedural grounds rather than consensual orders like the dismissal in this case.

For purposes of an equitable analysis, the dismissal in this case should be viewed in the context of the Stipulation which precipitated it. As the District Court noted, the parties to the Stipulation clearly knew how to provide for contingencies such as future case law (i.e., NMA ) and knew that there were still pending constitutional challenges to the Coal Act. Coltec decided not to condition the dismissal of its constitutional claims on the ultimate outcome of these challenges, but deliberately forfeited its still viable constitutional claims, apparently because it believed they were unlikely to be successful in light of then-existing case law. It did so in exchange for valuable consideration in the form of a chance to pursue without litigation its premium differential claim, which it presumably believed it had a better chance of winning. In retrospect in light of the Supreme Court's decision in Eastern, Coltec may wish that it had not made this deal, but courts have not looked favorably on the entreaties of parties trying to escape the consequences of their own "counseled and knowledgeable" decisions. Fine Paper, 840 F.2d at 195.

Coltec's situation is analogous to the circumstances of other Rule 60(b) movants whose motions courts have denied in large part because of their deliberate decisions not to appeal unfavorable adjudications. See, e.g., id. at 188 (involving attorneys who chose not to appeal fee award others appealed); Marshall, 575 F.2d at 420 (involving school board that paid judgment after appeal rather than petitioning for certiorari). The Supreme Court addressed this situation in Ackermann v. United States, 340 U.S. 193 (1950), which involved the denaturalization of two naturalized German citizens during World War II. For monetary reasons, Ackermann declined to appeal, believing the issue would be resolved after the war. When the appeal of his brother-in-law, Keilbar, was successful, Ackermann filed for Rule 60(b) relief from his denaturalization. The Supreme Court held such relief was appropriately denied, explaining:

> Petitioner made a considered choice not to appeal, apparently because he did not feel that an appeal would prove to be worth what he thought was a required sacrifice of his home. His choice was a risk,

19

but calculated and deliberate and such as follows a free choice. Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong, considering the outcome of the Keilbar case. There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

Id. at 198.

Likewise, even if Coltec's decision to settle was improvident in hindsight, the decision has been made and cannot be revisited. Cf. Schwartz, 976 F.2d at 218 ("We find no meaningful distinction between a motion asking for relief from a decision not to appeal, as in Ackermann , and one that asks for relief from a decision to settle, as in this case."). The Court contrasted Ackermann's case to that of the successful Rule 60(b) petitioner in Klapprott v. United States, 335 U.S. 601 (1949), who also had failed to defend denaturalization charges but who had been in custody, sick, unable to procure counsel despite efforts to do so, and preoccupied by efforts to protect himself against grave criminal charges. Ackermann, 340 U.S. at 199–200. The Court observed, "By no stretch of imagination can the voluntary, deliberate, free, untrammeled choice of petitioner not to appeal compare with the Klapprott situation." Id. at 200. The District Court did not err in determining that Coltec similarly must bear the consequences of its informed, counseled and voluntary decision.

Our decision in Boughner, 572 F.2d 976, which Coltec cites, granting Rule 60(b) relief, is distinguishable from the facts of the present case. The Boughner appellants had lost summary judgment motions because their attorney, who failed to file opposing papers, was inexcusably negligent. Id. at 977. Coltec, unlike these litigants, deliberately chose to negotiate away its constitutional claims while actively represented by competent counsel.

Coltec also argues that it should not be punished for serving the interests of judicial economy by bowing to the weight of then-existing decisional law holding the Coal Act constitutional instead of continuing constitutional litigation

20

would have been borderline frivolous. It appeals to this court's sense of justice, claiming that it is fundamentally unfair for it to be forced to pay unconstitutional Coal Act premiums when the government has waived the premiums of companies that had not yet paid the premiums and refunded premiums of companies that settled before Eastern. See Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund, 249 F.3d 519, 523 (6th Cir. 2001).

The Fund responds that Coltec is not similarly situated to the companies that did not settle because Coltec got the benefit of its bargain and, had Eastern turned out differently, it might have been in a better position than companies that did not settle. We agree. Enforcing Coltec's bargain is not a punishment and is not unfair. Moreover, this court has already rejected such disparate treatment of "similarly" situated parties as a basis for Rule 60(b) relief. We stated, "The only showing made in support of Rule 60(b) relief in this case is that litigants who pursued appellate remedies fared better than litigants who did not. The Marshall case explicitly forecloses Rule 60(b) relief on that ground." Fine Paper, 840 F.2d at 194.

The United States further contends that if Coltec prevails, the government will have no incentive to settle constitutional cases. The government persuasively argues that if Coltec is allowed to renege on the Stipulation and the Agreement, then:

> any settlement involving the abandonment of constitutional claims would be illusory [and][a]ny party that bargained away constitutional claims that later turned out to have merit could renege on its agreement. As a result, the United States would have no incentive to enter into settlement agreements in [such] cases, and litigants would lose the ability to trade constitutional claims -- even highly questionable ones -- for valuable consideration. [Further,] . . . the courts would be inundated with constitutional claims which could no longer be settled as well as parties seeking to reopen long-closed cases based on more recent precedent.

21

Br. of United States at 12.

Finally, Coltec claims that the Fund will suffer no undue prejudice if Rule 60(b) relief is granted. To the contrary, the Fund would in fact lose the benefit of the bargain it made with Coltec. Like Coltec, the Fund took a deliberate risk -- which in fact materialized when it lost NMA-- in exchange for a particular benefit, the security of the contemplated escrow. If Coltec were to prevail, the Fund would be prejudiced by losing the benefit it earned. For these reasons, the District Court did not abuse its discretion by failing to grant Coltec's Rule 60(b) motion.16

3. Other Post-Eastern Rulings on Rule 60(b) Motions by
     Coal Companies

Our conclusion that the District Court properly denied Coltec's Rule 60(b) motion is in line with the decisions of the other courts that denied relief sought by companies which settled or paid premiums pursuant to final judgments before Eastern. In Blue Diamond Coal, a coal company that had paid the Coal Act premiums it owed after unsuccessfully litigating its constitutional claims all the way to the Supreme Court, Blue Diamond Coal Co. v. Chater, 519 U.S. 1055 (1997) (denying writ of certiorari), moved for Rule 60(b)(6) relief. The district court granted relief, Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.), No. 3:93-CV-473, 1998 U.S. Dist. LEXIS 22711 (E.D. Tenn. Nov. 4, 1998), but the Court of Appeals for the Sixth Circuit reversed, stating that a change in decisional law, even when based on constitutional principles, is generally insufficient to justify Rule 60(b)(6) relief. Blue Diamond Coal Co., 249 F.3d at 524. It rejected the district court's analogy to a line of cases which establishes that post-judgment relief may be granted when litigants involved in the same transaction or injury get divergent judgments

_____

16. Additionally, the District Court's denial of Coltec's motion for reconsideration based on the SSA letter was not an abuse of discretion. The letter was not "new evidence" in that Coltec received it while the Rule 60(b) motion was under consideration by the court. Moreover, the District Court did not abuse its discretion because the letter is an extension of the Eastern decision; to the extent Eastern does not justify Rule 60(b) relief, neither does the SSA letter.

due to a change in decisional law, see id. at 525, because those cases involve "transactions with a much tighter nexus . . . than a law passed by Congress to regulate the payment of medical health benefits to the retirees of an entire industry." Id. at 526. It also found that the equities favored denial of relief, citing the general interest in finality. The Court of Appeals noted that the judgment had been fully executed before Eastern was decided. See also Templeton Coal Co. v. Apfel, No. 93-158 (S.D. Ind. Nov. 17, 1999) (denying Rule 60(b)(6) relief to coal company that had lost its constitutional challenge in district and circuit court and filed a petition for certiorari which was denied by the Supreme Court); Davon, Inc. v. Apfel, No. 93-198 (S.D. Ind. Nov. 17, 1999) (same).

The case with the facts most similar to this one is Holland v. Virginia Lee Co., 188 F.R.D. 241 (W.D. Va. 1999). Virginia Lee had paid the Fund a set amount in settlement of all past and future premium liability before there was any binding law in the Fourth Circuit as to the constitutionality of the Coal Act. The district court in Virginia Lee denied the company's Rule 60(b)(6) motion, finding that it had no grounds for relief from its voluntary settlement and could not otherwise show extraordinary circumstances. The court emphasized the extraordinary nature of subsection (6) relief, noting that a change in law does not, alone, justify such relief, even when the change is based on constitutional principles, and it rejected various fairness arguments similar to those made by Coltec here. Id. at 254-55. The court also rejected the companies' argument that their SSA letters justified relief, finding that these letters were not meant to affect final judgments and that, in any case, the SSA does not have the authority to do so. Id. at 256; see also Lindsey Coal Mining Co. Liquidating Trust v. Apfel, No. 94-143 (W.D. Pa. Aug. 4, 1999) (denying relief to a coal company that lost its constitutional challenge in district and appeals court and did not petition for certiorari, based in part on the District Court's denial here).

23

C. The District Court's Award of Seven Million Dollars to
     the Fund

Coltec argues that the District Court had no "jurisdiction"
to award monetary damages to the Fund because the Fund
did not request any monetary damages and did not prevail
on its one declaratory judgment counterclaim.17 In
response, the Fund points out that it asked for such relief
as was just, and argues that the judgment is authorized by
Federal Rule of Civil Procedure 54(c) which provides that
"every final judgment shall grant the relief to which the
party in whose favor it is rendered is entitled, even if the
party has not demanded such relief in the party's
pleadings." Fed. R. Civ. P. 54(c); see also Kirby v. HUD, 745
F.2d 204, 207 (3d Cir. 1984) ("As long as the plaintiffs have
stated a claim for relief, it is the court's obligation to grant
the relief to which the prevailing party is entitled whether
it has been specifically demanded or not.").

In awarding the Fund some seven million dollars, the
District Court enforced the "so ordered" Stipulation and the
Agreement, and the court certainly had the authority to do
so. See Halderman v. Pennhurst State Sch. & Hosp., 901
F.2d 311, 317 (3d Cir. 1990) (holding that courts have
jurisdiction to enforce settlement agreements incorporated
into orders); Washington Hosp. v. White, 889 F.2d 1294,
1299 n.9 (3d Cir. 1989) (holding that the fact that court
had "so ordered" stipulation gave document"the same
effect as a consent order or consent decree" and gave the
court jurisdiction to enforce it). As the Fund argues, its
entitlement to pre-Eastern premiums arises from the
Agreement, not the Coal Act. This renders irrelevant
Coltec's lengthy discussion of the court's lack of authority
under the Coal Act to impose liability on it. The real issue
is whether the Stipulation, in conjunction with the
Agreement, which was "so ordered," authorizes the
judgment imposed by the court.

_____

17. Coltec also asserts it would be illegal for it to pay the Fund without
Coal Act liability, under the Labor Management Relations Act S 302, 29
U.S.C. S 186 (barring employer gifts to labor organizations). However,
S 302(c)(2) exempts "payment . . . of any money . . . in satisfaction of a
judgment of any court . . . or in compromise, adjustment, settlement, or
release of any claim." 29 U.S.C. S 186(c)(2).

24

Coltec contends that the Stipulation does not provide a basis for the award. It asserts that the document is unambiguous and very limited, arguing that no language in the Stipulation can be construed as an admission of liability, an acknowledgment that any of its retiree assignments or premium assessments are valid, or an agreement to make premium payments. It claims that the District Court erroneously augmented the plain meaning of the Stipulation by resorting to the "context" of the document when there had been no showing of any ambiguity. We reject this contention. As we previously noted, the language of the Agreement and Stipulation supports the District Court's interpretation of the parties' deal. Simply put, the Fund is entitled to the money pursuant to the parties' bargain.

The District Court's finding that the Fund was, in these circumstances, entitled to the disbursement it requested is unexceptional. Coltec argues, however, that the Agreement and the Stipulation reference "Coal Act premiums" and that, in light of the SSA letter, it did not have any statutory premium liability at the time of the judgment. This argument is easily disposed of because the premiums referred to in the Stipulation and the Agreement clearly refer to the premiums due before Eastern was decided. App. at 232.

IV.

CONCLUSION

In sum, Coltec made a binding agreement with the Fund when it signed the Agreement, the Escrow Agreement, and the Stipulation. The District Court found no basis in the Supreme Court's ruling in Eastern to allow Coltec to back out of its agreements, nor do we. Because Coltec failed to open and maintain the escrow account as represented to the court and to the Fund, Coltec does not deserve relief from the agreements it freely entered.

For the reasons described herein, the order and the judgment of the District Court are affirmed.

25

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit